# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROLYN M. HUTTEMANN, individually and on behalf of all others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>TIMOTHY BARBERICH, CHADWICK CORNELL, CYNTHIA FELDMANN, DOUGLAS GODSHALL, SETH HARRISON, RAY LARKIN, JR., STEPHEN OESTERLE, ROBERT STOCKMAN, ROBERT THOMAS, DENIS WADE, and HEARTWARE INTERNATIONAL, INC. )<br><br>Defendants. ) | **C.A. No.: 16-11618**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |

Plaintiff Carolyn M. Huttemann ("Plaintiff"), by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this class action on behalf of himself and the public stockholders of HeartWare International, Inc. ("HeartWare" or the "Company") against the members of HeartWare's Board of Directors (the "Board", "Individual Defendants", or "Defendants") for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a)) and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. § 240.14d-9(d) ("Rule 14D-9") and breaches of fiduciary duties arising out of their attempt to sell the Company to Medtronic, Inc. and its parent corporation, Medtronic plc (collectively "Medtronic") for inadequate consideration.

1

2.      On June 27, 2016, Medtronic and the Company announced that they had entered into an Agreement and Plan of Merger dated June 27, 2016 ("Merger Agreement"), by which Medtronic, through its affiliate Medtronic Acquisition Corp. ("Merger Sub") commenced a tender offer to acquire all of the outstanding shares of HeartWare for $58.00 per share in cash ("Proposed Transaction"). The Proposed Transaction is valued at approximately $1.1 billion and is expected to close during Medtronic's second fiscal quarter ending October 28, 2016. The Proposed Transaction was unanimously approved by the Board.

3.      Medtronic and its affiliates commenced the tender offer on July 26, 2016. Unless extended or terminated earlier, the tender offer is scheduled to close at 11:59 P.M. (Eastern Time) on August 22, 2016.

4.      Also on July 26, 2016, the Company filed a Schedule 14D-9 Recommendation/Solicitation Statement ("Recommendation Statement") with the SEC. The Recommendation Statement is materially deficient and misleading because, *inter alia*, it fails to disclose material information about the financial projections of the Company used by its financial advisor, Perella Weinberg Partners LP ("Perella Weinberg"), in its *Discounted Cash Flow Analysis*. The Board relied upon Perella Weinberg's financial analyses, including the *Discounted Cash Flow Analysis*, in approving and soliciting stockholder support for the Proposed Transaction.

5.      The Recommendation Statement contains other material omissions that render it materially misleading, necessitating disclosure of further information about (i) the process culminating in the Proposed Transaction; and (ii) material inputs and assumptions underlying Perella Weinberg's financial analysis.

6.      Without additional information the Recommendation Statement is materially misleading in violation of federal securities laws.

7.      By unanimously approving the Proposed Transaction and authorizing the issuance of the Recommendation Statement, the Individual Defendants participated in the solicitation even though they knew, or should have known, that the Recommendation Statement was materially false and/or misleading. The Recommendation Statement is an essential link in accomplishing, and receiving shareholder approval for, the Proposed Transaction.

8.      Additionally, the Proposed Transaction provides stockholders with inadequate consideration. The Company's financial advisor, Perella Weinberg, conducted a discounted cash flow analysis that yielded a price as high as $72.00 per share. Other financial analysts also set price targets for the Company of $60.00 per share, which exceeds the price being offered to HeartWare stockholders.

9.      The inadequate price that stockholders are being offered in the tender offer is the result of a flawed sales process. The Company did not solicit interest from a single potential acquiror and failed to meaningfully negotiate with one other bidder who submitted an unsolicited indication of interest to purchase HeartWare.

10.     The Proposed Transaction was driven in part by Engaged Capital, LLC ("Engaged Capital") and its managing partner, Glenn Welling. Engaged Capital, who owns approximately 1.3% of the Company's outstanding stock, rallied against the Company's proposed acquisition of Valtech Cardio, Ltd. ("Valtech") in 2015 and pushed for the Company to sell itself to Medtronic shortly thereafter. To accomplish these ends, in 2016 Engaged Capital and the Board expanded the number of directors by two, with both additions to the Board being former employees of Medtronic. Indeed, one of the appointees was a former vice president at Medtronic who led the company's merger and acquisition activity. With the assistance of its conflicted financial advisor,

3

who received in excess of $30 million from Medtronic and its subsidiaries in the previous two years alone, the Board agreed to the Proposed Transaction for inadequate consideration.

11.     Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company. Specifically, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirors or even in continuing discussions and negotiations with potential acquirers; (ii) a provision that provides Medtronic with five calendar days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay Medtronic a termination fee of $27.5 million to enter into a transaction with a superior bidder. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of HeartWare.

12.     The Defendants have breached their fiduciary duties of care and loyalty. Plaintiff seeks to enjoin the Proposed Transaction unless and/or until Defendants cure their violations of federal securities laws and breaches of fiduciary duty.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Section 14(d), 14(e) of the Exchange Act, Rule 14D-9 promulgated thereunder, and Section 20(a) of the Exchange Act.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

14.     Venue is proper in this Court because HeartWare maintains its principal place of business in this District, and one or more of the Defendants reside, are found, have agents and/or regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c).

## PARTIES AND RELEVANT NON-PARTIES

15.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of HeartWare.

16.     HeartWare is a corporation organized and existing under the laws of the State of Delaware. It maintains its principal executive offices at 500 Old Connecticut Path, Framingham, Massachusetts, 01701. HeartWare is named as a defendant for the purposes of providing full and complete relief.

17.     Defendant Timothy Barberich has been a director of the Company since April 2008.

18.     Defendant Chadwick Cornell ("Cornell") has been a director of the Company since March 2016. Defendant Cornell worked at Medtronic from 2003 to 2013 and supported the transaction activity of various Medtronic businesses and initiatives. Cornell served as Vice President of Corporate Development, where he was responsible for global acquisition, divestiture, venture investment and strategic transaction activity.

19.     Defendant Cynthia Feldmann has been a director of the Company since March 2012.

20.     Defendant Douglas Godshall ("Godshall") has been the Company's Chief Executive Officer since September 2006 and a member of the Board since October 2006.

21.     Defendant Seth Harrison ("Harrison") has been a director and deputy chairman of the Board since November 2004. Harrison served as the Company's Chief Executive Officer from July 2003 through November 2004.

22.     Defendant Ray Larkin, Jr. has been a director of the Company since 2008.

23.     Defendant Stephen Oesterle has been a director of the Company since January 2016. Defendant Oesterle was employed by Medtronic and its affiliates from 2002 through 2015.

Oesterle was Medtronic, Inc.'s Senior Vice President for Medicine and Technology, was a member of the Executive Committee where he provided executive leadership for Medtronic scientific research, technological strategies, and development of relationships with medical communities, technical universities, financial institutions, and emerging medical device companies around the world.

24.     Defendant Robert Stockman has been a director of the Company since December 2006.

25.     Defendant Robert Thomas has been a director of the Company since November 2004.

26.     Defendant Denis Wade has been a director of the Company since December 2004.

27.     Defendants named in paragraphs 17 through 26 are collectively referred to as the Board or the Individual Defendants.

28.     Relevant non-party Medtronic is a Minnesota Corporation that is owned by to Medtronic plc. Medtronic plc, headquartered in Dublin, Ireland, is one of the world's largest medical technology, services, and solutions companies.

29.     Relevant non-party Medtronic Acquisition Corp. is a Delaware corporation and wholly-owned subsidiary of Medtronic that was created for the purposes of effectuating the Proposed Transaction.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

30.     By reason of Individual Defendants' positions with the Company as officers or directors, they are in a fiduciary relationship with Plaintiff and the other public stockholders of HeartWare and owe duties of care and loyalty.

31.     To comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the corporation's stockholders;

(b)     unfairly favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's stockholders; and/or

(d)     will unfairly provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public stockholders.

32.     In accordance with their duties of loyalty, the Individual Defendants are obligated to refrain from:

(a)     participating in any transaction where the Individual Defendants' loyalties are divided;

(b)     participating in any transaction where the Individual Defendants unfairly receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public stockholders.

33.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of care and loyalty owed to plaintiff and other public stockholders of HeartWare.

**CLASS ACTION ALLEGATIONS**

34.     Plaintiff brings this action as a class action on behalf of all persons and/or entities that own HeartWare common stock (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have a controlling interest.

35.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. The Company represented in the Merger Agreement that as of the close of business on June 24, 2016, it had approximately 17,552,633 shares of common stock outstanding. HeartWare or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

36.     Questions of law and fact are common to the Class, including (i) whether Defendants solicited stockholder approval of the Proposed Transaction through a materially false or misleading Recommendation Statement in violation of federal securities laws; and (ii) whether Plaintiff and other Class members will suffer irreparable harm if securities laws violations are not remedied before the close of the tender offer; (iii) whether the Individual Defendants breached their fiduciary duties to Plaintiff and the Class; and (iv) whether the Class entitled is to injunctive relief as a result of Defendants' wrongful conduct.

37.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

38.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

39.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## FURTHER SUBSTANTIVE ALLEGATIONS

*Company Background and its Poise for Growth*

40.     HeartWare develops and manufactures miniaturized implantable heart pumps, or ventricular assist device ("VAD"), to treat patients suffering from advanced heart failure. The Company's flagship product, the HeartWare Ventricular Assist System ("HVAD System"), includes the world's smallest full-support VAD, patient accessories, and surgical tools. The HVAD System is designed to provide circulatory support for patients in the advanced stage of heart failure.

41.     In addition to the HVAD System, the Company has multiple technologies in development that are designed to offer progressively less invasive mechanical circulatory support options for patients with end-stage heart failure. One of these technologies is the next-generation miniaturized device known as the MVAD System. The MVAD System is based on the same technology platform as the HVAD System but adopts an axial flow instead of a centrifugal flow. The MVAD System is being developed in multiple designs. The MVAD pump is less than one-half the size of the HVAD pump and its various configurations and surgical placements is designed to reduce surgical invasiveness while producing superior clinical results.

42.     On July 20, 2015, the Company announced that it commenced its MVAD System CE Mark international clinical trial. Although HeartWare paused the MVAD System clinical trial in the third quarter of 2015, the Company is confident that it can correct past mistakes. In a January

11, 2016 press release, Defendant Godshall stated that the Company made "[m]eaningful progress . . . to identify improvements to manufacturing specifications" and "has detected certain software algorithms" that caused issues. He also remarked that the MVAD System was "performing well on most fronts" and that the Company "remain[ed] optimistic that an improved MVAD System will emerge from this additional evaluation."

43.     In addition to developing new products, the Company expanded its commercial footprint in 2015. In a February 25, 2016 press release announcing the Company's fourth quarter and full-year 2015 financial results, Defendant Godshall stated that the Company "made substantial progress in expanding our commercial footprint in the past year, adding 55 new hospital centers globally. With a presence in 47 countries, and more than 300 commercial centers, we have an established network of customers from which to grow our business well into the future[.]"

44.     Between the development of new products and a well-established network of customers, the Company is in a strong position to grow its business in an expanding market. The June 27, 2016 joint press release announcing the Proposed Transaction detailed how the market for heart failure products will increase in the future. Heart failure affects more than five million people in the U.S. alone, but with the "aging of the population, Medtronic estimates that the number of patients with heart failure could exceed eight million by 2030." Medtronic estimates that the "global VAD market is approximately $800 million currently and worldwide is expected to grow in the mid-to-high single digits for CY16-17, and accelerate to high-single/low-double digits beyond CY17."

45.     Despite the Company's strong position and highly anticipated products, the Board agreed to the Proposed Transaction when HeartWare was experiencing a temporary drop. A June 27, 2016 Reuters article quoted a Cowen and Co analyst note stating that "Medtronic is catching

HeartWare at near bottom[.]" Therefore, Medtronic is getting a bargain basement price for a company that, according to the Reuters article, "is the second biggest player in the U.S. heart pumps market with a 40% share[.]"

***The Inadequate Sales Process***

46.     The Board conducted an inadequate sales process that was designed to reach an agreement with Medtronic. The Board failed to contact one potential purchaser over the course of negotiations and ignored one potential purchaser that submitted an unsolicited indication of interest. Rather than take action to encourage a competitive bidding process, the only action the Board took was to stack the Board with directors who would ensure a sale of the Company to Medtronic. Indeed, the Company expanded the size of the Board and appointed two former executives of Medtronic in January and March 2016. Unsurprisingly, within months of their appointment and with the assistance of a conflicted financial advisor, the Proposed Transaction was executed.

47.     Negotiations between HeartWare and Medtronic executives have been ongoing for nearly a year before the parties entered into the Merger Agreement.

48.     In July 2015, Defendant Godshall met with several Medtronic representatives to discuss ways that HeartWare and Medtronic could "potentially work together."

49.     On September 1, 2015, the Company announced that it entered into a definitive agreement to acquire Valtech. Engaged Capital publicly expressed its disagreement with the proposed acquisition, launched a proxy fight, and urged the Company's stockholders to vote against the deal.

50.     In a December 28, 2015 letter from Engaged Capital to the Board, Engaged Capital announced that it would nominate three individuals to serve on the Company's board.

51.     Instead of the deal with Valtech, in a publicly available letter dated January 7, 2016 and addressed to the Company's Board, Engaged Capital stated that it agreed with other stockholders that the "ultimate destiny for HTWR [HeartWare] is a sale to a strategic acquirer" but that it was "not advocating for a sale of the Company today." (Emphasis in original.) Engaged Capital continued that given the "currently depressed share price and "uncertainty regarding the restart of the of the MVAD CE Mark clinical trial, we believe it is unlikely that the Board would be able to negotiate a sale of the Company at a premium that would be acceptable to shareholders today."

52.     Nearly six months later, on January 9, 2016, Medtronic representatives indicated to Defendant Godshall that Medtronic "remained interested in the VAD market" and "continued to believe there were potential synergies in the sales processes and technology portfolios of HeartWare and Medtronic." Godshall responded that a "further conversation" might be "productive."

53.     Godshall and the other members of the Board were already working to ensure that a deal with Medtronic would be reached by stacking the Board with people who had relationships with Medtronic.

54.     On January 11, 2016, the Company issued a press release announcing that Defendant Oesterle, who was employed by Medtronic for many years, was appointed to the Board, effective January 18, 2016. According to the Company's January 11, 2016 press release, Oesterle's appointment "expand[ed] HeartWare's Board of Directors to nine directors."

55.     On January 15, 2016, Godshall and the Medtronic representative had another discussion where Godshall indicated that the Company "remained open to exploring ways" that

the two companies could "work together." The parties agreed to have more details discussions about HeartWare's research and development and clinical efforts in the future.

56.     On January 17, 2016, a representative from a company identified in the Recommendation Statement as "Company A" informed Defendant Godshall that it was interested in exploring an acquisition of HeartWare. Godshall does not appear to have relayed the message to any members of the Board.

57.     Godshall continued discussions with Medtronic representatives and the parties entered into a confidentiality agreement on January 19, 2016.

58.     On January 27, 2016, Defendant Godshall met with Medtronic representatives at Medtronic's offices in Minneapolis, Minnesota. Medtronic representatives indicated that "in light of the significant strategic alignment between Medtronic and HeartWare, Medtronic was potentially interested in partnering with Heartware."

59.     On January 29, 2016, a Medtronic representative informed Godshall that Medtronic's senior management intended to meet in the coming days to discuss "potential strategic transactions" involving HeartWare. Godshall relayed this message to the Chairman of the Board later that day.

60.     On February 4, 2016, HeartWare and Company A executed a confidentiality agreement in connection with a possible negotiated transaction. Godshall apparently did not relay this information to the Board at this time.

61.     Company A was persistent in expressing its interest in a negotiated business combination with HeartWare. In addition to informing Godshall of its interest, on February 13, 2016, a Company A representative contacted the Chairman of the Board to express an interest in a strategic combination.

62.     On March 1, 2016, Company A's financial advisor contacted Perella Weinberg to reiterate Company A's interest in a strategic combination with HeartWare. The Company's management instructed Perella Weinberg that Company A should "provide specific details of its proposal" and sought additional information about Company A's "financial condition." Despite Company A's repeated attempts to engage HeartWare and its willingness to enter into a confidentiality agreement, there were no further discussions between HeartWare and Company A.

63.     Following March 1, 2016, the Company negotiated exclusively with Medtronic. The Board did not solicit indications of interest from third parties and never attempted to reengage Company A. Rather than take steps to encourage a competitive bidding process, the Board took further action to ensure a closer relationship between HeartWare and Medtronic.

64.     On March 14, 2016, the Company issued a press release announcing the appointment of Defendant Cornell to the Board, which "expands HeartWare's Board of Directors to ten". According to the press release, Cornell's appointment was a joint decision and part of a Cooperation Agreement between HeartWare and Engaged Capital, LLC that was announced in January 2016. Not only was Cornell previously employed by Medtronic, he was a former vice president in charge of merger and acquisition activity at Medtronic.

65.     On April 28, 2016, Medtronic submitted an indication of interest to acquire HeartWare for $48.00 per share in cash. Medtronic also indicated its "expectation" that it could complete due diligence and have a definitive agreement negotiated by June 30, 2016.

66.     The Board met on May 3, 2016 to discuss the letter. At the meeting the Board, management, and representatives of Perella Weinberg discussed HeartWare's strategic alternatives, a transaction with Medtronic and "other potential transactions, including a discussion

of whether there might be other potential acquirors of HeartWare." The Board did not reach a decision at the meeting about how to respond.

67.     The Board met again on May 18, 2016 and concluded that Medtronic's indication of interest to purchase the Company for $48.00 per share "undervalued the Company." The Board also discussed the advantages and disadvantages of contacting other parties that might be potentially interested in acquiring HeartWare.

68.     On May 19, 2016, Godshall relayed the Board's rejection of the offer. On a call with Medtronic representatives three days letter to discuss the best way to proceed Godshall stated that "there was not a consensus" within the Board about the "price at which HeartWare would be willing to pursue a transaction."

69.     On May 23, 2016, HeartWare proposed to Medtronic that the parties enter into a new confidentiality agreement that contained a standstill provision. Medtronic refused to execute a new confidentiality agreement primarily because Medtronic was "unwilling to agree to any provisions that would restrict its ability to approach HeartWare's stockholders directly regarding its interest in acquiring HeartWare."

70.     On May 31, 2016, Medtronic submitted a revised indication of interest to acquire the Company for $50.50 per share in cash. In the letter, Medtronic expressed its "strong preference" to work with the Board to find a "mutually agreeable negotiated transaction" because in its view and "in light of the challenges faced by the Company and the competitive dynamics of HeartWare's market, HeartWare's stockholders would strongly favor Medtronic's proposal."

71.     On June 1 and June 2, 2016, the Board met to consider Medtronic's proposal. At the meeting, the Board discussed HeartWare's strategic alternatives, potential acquisition transactions that it could pursue, and whether there "might be other potential acquirors of

HeartWare, and if so, the price that these potential alternative acquirors might be prepared to pay for the Company and the likely timing for their consideration of a transaction with the Company."

72.    On June 3, 2016, Godshall informed Medtronic that the Company rejected the offer.

73.    On June 7, 2016, Medtronic submitted a revised indication of interest to acquire the Company for $53.00 per share in cash, plus a contingent value right ("CVR") to a $5.00 cash payment per share when "the first patient enrollment in a human clinical trial, on or before June 30, 2018, of a Fully Implantable Left Ventricular Assist System". Medtronic indicated again indicated that it would consider "making a direct public appeal to the Company's shareholders" if the parties could not reach a private negotiated transaction.

74.    The Board met on June 8, 2016 to discuss the letter. The Board authorized Defendant Godshall to respond with a counterproposal with (i) $55.00 per share in cash; (ii) expand the circumstances that would trigger a CVR; plus (iii) Medtronic's agreement to distribute any payments received by Medtronic from Valtech Cardio Ltd. In respect of HeartWare's debt and equity investments in Valtech to the Company's stockholders.

75.    That same day Godshall responded to Medtronic with a counterproposal of (i) $55.50 per share in cash; plus (ii) a CVR on revised terms of $4.00 per share; plus (iii) the distribution to HeartWare stockholders of any consideration received by HeartWare from Valtech in respect of HeartWare's debt and equity investments in Valtech.

76.    On June 10, 2016, Medtronic submitted what it said was its best and final offer to acquire all outstanding HeartWare shares for $58.00 per share in cash. Medtronic also requested "to proceed expeditiously and announce the transaction by June 27, 2016."

77.    On June 11, 2016, the Board authorized management to negotiate a potential transaction based on the terms outlined in Medtronic's June 10, 2016 indication of interest.

78.     On June 21, 2016 the Board held meetings with members of management and its advisors. The Board discussed the advantages and disadvantages of contacting other parties before entering into a definitive agreement with Medtronic, determined "after extensive discussion" that it was "very unlikely" that a third party "would be capable of and willing to deliver as significant a premium" for HeartWare as Medtronic, and "highly unlikely to be in a timeframe that would be consistent with pursuing a transaction with Medtronic on a negotiated basis."

79.     On June 26, 2016, the Board approved the transaction and amendments to senior officers' employment agreements for the benefit of those executives.

80.     The Merger Agreement was executed the following day.

81.     On July 26, 2016, Medtronic and its affiliates commenced the tender offer.

***The Proposed Transaction Provides Stockholders Inadequate Consideration***

82.     Medtronic is purchasing the Company at a time when its stock price is temporarily depressed.

83.     A June 27, 2016 article published on Reuters.com mentioned that HeartWare's stock price was down 61% in the year to June 24, 2016 closing price.

84.     One Cowen and Co. analyst wrote that "Medtronic is catching HeartWare at a near bottom which makes the acquisition premium more palatable." In other words, the acquisition premium is not nearly as impressive since the stock price is temporarily depressed and "near bottom."

85.     Furthermore, Jim Cramer, a well-known financial analyst and commentator, stated that HeartWare's sale was a "smart deal" for Medtronic. Cramer also remarked that the deal was a "home run" for Medtronic.

86.     Medtronic appreciates that its purchase of HeartWare is for a low price. Mike Coyle,  Medtronic's executive vice president and president of the Cardiac and Vascular Group, stated in the June 27, 2016 joint press release announcing the Proposed Transaction that the "addition of HeartWare's innovative portfolio adds to our expanding portfolio of diagnostics, therapeutics and services that address heart failure patients[.]" Coyle continued: "The team at HeartWare has established excellent relationships with its hospital customers and built a strong position and reputation in the marketplace. This transaction, once closed, will be a further, important step toward Medtronic offering a complete suite of solutions to address patient needs across the heart failure care continuum."

87.     Financial analysts have also recognized that the $58.00 per share that HeartWare's stockholders will receive in the Proposed Transaction is inadequate. Furthermore, at least one analyst had a price target of $60.00 per share.

88.     Moreover, the *Discounted Cash Flow Valuation Analysis* that Perella Weinberg conducted using management's forecast yielded a price as high as $72.00 per share. Indeed, DCF conducted using management's forecast yielded a range of $55.50 to $72.00 per share, with the deal price of $58.00 being barely above the low end of the range.

***Conflicted Financial Advisor***

89.     Perella Weinberg served as financial advisor to the Company. Perella Weinberg suffers from serious conflicts of interest. Although the Recommendation Statement does not disclose how much the Company has paid Perella Weinberg in the previous two years, Perella Weinberg has received substantial compensation from Medtronic and its affiliates. Indeed, in the two years preceding the issuance of the Recommendation Statement, Perella Weinberg has received "approximately $36 million in compensation for certain investment banking services" it

provided to Medtronic and its affiliates, including acting as financial advisor to Medtronic in its acquisition of Covidien plc, which was announced on January 26, 2015.

***The Materially Misleading and Incomplete Recommendation Statement***

90.      The Individual Defendants are obligated under the federal securities laws to disclose information necessary to render their statements in the Recommendation Statement not materially misleading, and are bound by their fiduciary duties to disclose all material information about the Proposed Transaction to HeartWare's stockholders so that they can make a fully informed decision about whether to tender their shares or seek appraisal. The Individual Defendants have violated Section 14 of the Exchange Act and their fiduciary duties by soliciting stockholder approval through a materially deficient Recommendation Statement.

**A.    Projections and Discounted Cash Flow Analysis**

91.      The Recommendation Statement fails to disclose material information about HeartWare's projections and the omission of such information renders the Recommendation Statement materially misleading.  Most critically, the Recommendation Statement should disclose HeartWare's projected unlevered free cash flows.  These projected free cash flows were a key input for the Discounted Cash Flow Analysis performed by Perella Weinberg, but they are not disclosed.  Without disclosure of the projected free cash flows and the other information set forth below, the projections that are disclosed (i.e., the "Company Management Forecasts") are materially misleading.

92.      The "Company Management Forecasts" provide projections for revenue, gross margin, EBITDA, EBIT and net income.  In the Discounted Cash Flow Analysis ("DCF") performed by Parella Weinberg underlying its fairness opinion being used to solicit stockholders'

support for the Proposed Transaction, the Recommendation Statement states that Parella Weinberg

conducted its analysis based on the "Company Management Forecasts" and a "Street Case" by:

- calculating, in each case, the present value as of June 24, 2016 of the estimated
  standalone unlevered free cash flows (calculated as adjusted earnings before interest
  payments after taxes, plus depreciation and amortization, minus capital expenditures,
  and adjusting for changes in net working capital and other cash flows) that HeartWare
  could generate for the remainder of fiscal year 2016 through fiscal year 2030 using
  discount rates ranging from 10.0% to 11.0% based on estimates of the weighted average
  cost of capital of HeartWare derived using the capital asset pricing model ("<u>CAPM</u>");
  and

- adding, in each case, terminal values calculated using perpetuity growth rates ranging
  from 2.0% to 3.0% and discounted using rates ranging from 10.0% to 11.0%.

93.     Not only are HeartWare's "estimated standalone unlevered free cash flows" not

disclosed but also no disclosure is made as to what adjustments were made to earnings to yield the

material input "adjusted earnings".  Nor is there any disclosure of capital expenditures, changes in

net working capital, taxes, depreciation, amortization, and "other cash flows" used to project

unlevered free cash flow.  Without these financial figures (and the information detailed below),

the Company Management Forecasts are materially misleading because they do not reflect the key

adjustments and inputs used by the Board's financial advisor for its fairness opinion analysis.  Such

adjustments and inputs were obviously necessary for Board's financial advisor to value the

Company but stockholders are not provided with them, instead being provided with only an

incomplete set of projections that are materially misleading given Defendants' omissions.

94.     Similarly, the Recommendation Statement should reconcile GAAP net income to

non-GAAP unlevered free cash flows and non-GAAP EBITDA, and disclose (i) NOL balances

and utilization; (ii) all figures for the stub period consisting of the second half of 2016 or whatever

stub period Perella Weinberg used; (iii) all figures for the Street Case that Perella Weinberg used;

and (iv) all figures for Perella Weinberg's discounted cash flow sensitivity analysis in which HeartWare's pipeline products and its other operations were valued separately.

95.     The Recommendation Statement should also (i) explain the term "adjusted earnings", including what adjustments were made, quantify the adjustments, and explain the basis for such adjustments; (ii) explain and quantify "other cash flows"; (iii) indicate the effective date of the DCF, and specify the period encompassed by the "remainder of fiscal year 2016"; (iv) identify all assumptions underlying Perella Weinberg's estimates of HeartWare's weighted average cost of capital, including quantifying and providing the basis for each assumption; and (v) clarify that CAPM is used to calculate the cost of equity and not weighted average cost of capital.

96.     Regarding the second bullet point in paragraph 92 above, the Recommendation Statement should disclose the terminal implied pricing multiples (EV to Revenue and/or EV to EBITDA) corresponding to the assumed perpetuity growth rates.

97.     Additionally, regarding the DCF, the Recommendation Statement should (i) explain and quantify net, non-operating assets; (ii) whether Perella Weinberg considered the net, non-operating assets in the *Selected Publicly Traded Companies Analysis* and the *Selected Transaction Analysis*, and if so, why not; and (iii) clarify that the discount rate was applied to cash flows from the pipeline products and not to the revenues.

### B.     Perella Weinberg's Other Financial Analyses

98.     The Recommendation Statement fails to disclose material data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor, Perella Weinberg, in addition to the disclosure deficiencies surrounding the DCF and projections set forth above.

99.     The Recommendation Statement should provide (i) a valuation summary detailing the calculation of fully dilutes shares; (ii) equity value at the unaffected price and the offer price; and (iii) enterprise value at the unaffected and offer price. Additionally, the Recommendation Statement should disclose the pricing multiples that were observed, if any.

100.    In Perella Weinberg's *Selected Publicly Traded Companies Analysis*, the Recommendation Statement should disclose: (i) the objective selection criteria used to selected the examined companies; (ii) the Street Case projections that Perella Weinberg used; (iii) the observed company-by-company pricing multiples; and (iv) the metrics that Perella Weinberg examined. Additionally, the Recommendation Statement should disclose the other multiples that Perella Weinberg examined, if any.

101.    In Perella Weinberg's *Selected Transactions Analysis*, the Recommendation Statement should disclose the transaction-by-transaction profit margins.

### C.     Conflicts of Interest

102.    The Recommendation Statement states that Defendants Cornell and Oesterle were "previously employees of Parent [Medtronic], and each continues to hold shares or equity awards in respect of Medtronic common stock." The Recommendation Statement omits the monetary value and amount of shares or equity awards that Cornell and Oesterle hold in Medtronic, which is material information and renders the current disclosures misleading, including particularly the representation in the Recommendation Statement that HeartWare is unaware of "any actual or potential conflicts of interest between HeartWare or its affiliates, on the one hand, and (i) HeartWare's executive officers, directors or affiliates or (ii) Parent, Purchaser [Medtronic or Merger Sub] or their respective executive officers, directors or affiliates, on the other hand." The extent of these defendants' holdings in Medtronic, the buyer, is critical because it presents the

potential for a severe conflict of interest. The amount of Cornell's and Oesterle's equity holdings is material here where there was a single-bidder process with their former employer being the purchaser, and within six months of their joining the Board the Merger Agreement was executed.

### D. Process leading to the Proposed Transaction

103.    The Recommendation Statement also fails to disclose material information about the events and circumstances culminating in the execution of the Merger Agreement.

104.    The Recommendation Statement states that on January 17, 2016, a representative from Medtronic contacted Godshall and informed him that it was interested in exploring an acquisition of HeartWare. The Recommendation Statement states that weeks later, on February 13, 2016, a Company A representative contacted the Chairman of the Board to express an interest in a strategic combination. The Recommendation Statement should disclose: (i) whether (and when) Godshall informed the Board that Company A contacted him and express an interest in the acquisition of HeartWare; (ii) whether February 13 was the first time the Chairman found out that Company A was interested in a potential acquisition; (iii) whether the entire Board discussed the potential acquisition; and (iv) whether specific terms were discussed.

105.    The Recommendation Statement states that after March 1, 2016 the Company did not have further discussions with Company A. The Recommendation Statement should disclose the reason discussions ended, particularly given that Company A representatives expressed interest on three different occasions to acquire HeartWare and entered into a confidentiality agreement. The Recommendation Statement should also disclose the reason the Company did not contact Company A between March 1, 2016 and the execution of the Merger Agreement.

106.    The Recommendation Statement states that at the May 3, 2016 Board meeting, the Board discussed "whether there might be other potential acquirors of HeartWare." The

Recommendation Statement should disclose whether Company A was mentioned, whether the Board discussed contacting Company A in particular, whether the Board contacted Company A, and if not, the basis for not contacting the company.

107.    The Recommendation Statement states that on June 21, 2016 the Board discussed that it was "very unlikely" that a third party "would be capable of and willing to deliver as significant a premium" for HeartWare as Medtronic, and "highly unlikely to be in a timeframe that would be consistent with pursuing a transaction with Medtronic on a   negotiated basis." The Recommendation Statement should disclose the Board's basis for determining that it was "very unlikely" that a third party would offer the same premium since Company A was a known interested party.

108.    The Recommendation Statement should disclose how much HeartWare and its affiliates have paid to Perella Weinberg for the two year period preceding July 26, 2016.

109.    The Recommendation Statement should disclose the "certain investment banking services" for which Medtronic paid $36 million to Perella Weinberg in the two years preceding July 26, 2016.

110.    The Recommendation Statement states that Perella Weinberg's fee is "currently estimated to be approximately $16 million upon the closing of the" Proposed Transaction. The Recommendation Statement should disclose: (i) how Perella Weinberg's fee is calculate; (ii) what aspect of the fee necessitates "estimation".

***The Preclusive Deal Protection Devices***

111.    In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

24

112.    Section 6.3(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers to procure a price in excess of the amount offered by Medtronic. Section 6.3(a) demands that the Company terminate any and all prior or on-going discussions with other potential acquirers.

113.    Pursuant to §6.3(c) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify Medtronic of the bidder's identity and the terms of the bidder's offer. Thereafter, § 6.3(e) demands that should the Board determine to enter into a superior competing proposal, it must grant Medtronic five calendar days in which the Company must negotiate in good faith with Medtronic (if Medtronic so desires) and allow Medtronic to amend the terms of the Merger Agreement to make a counter-offer so that the competing proposal is no longer a superior proposal. In other words, the Merger Agreement gives Medtronic access to any rival bidder's information and allows Medtronic a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Medtronic and piggy-back upon the due diligence of the foreclosed second bidder.

114.    The Merger Agreement also provides that HeartWare must pay Medtronic a termination fee of $27.5 million to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a large naked premium for the right to provide the stockholders with a superior offer.

115.    Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes

or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

116.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(e) of the Exchange Act
### (Against All Defendants)

117.     Plaintiff repeats all previous allegations as if set forth in full herein.

118.     Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders to tender their shares in the Proposed Transaction.

119.     Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i] shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"

120.     The Recommendation Statement was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Recommendation Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

121.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

122.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement

to decide whether to tender their shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to expiration of the tender offer on August 22, 2016.

## COUNT II
### Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9
### (Against All Defendants)

123.    Plaintiff repeats all previous allegations as if set forth in full herein.

124.    Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders to tender their shares in the Proposed Transaction.

125.    Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Pursuant to Item 8 of SEC Rule 14d-9(d), the Board was required to "[f]urnish such additional information, . . . as may be necessary to make the [Recommendation Statement's] required statements, in light of the circumstances under which they are made, not materially misleading."

126.    As set forth above, the Recommendation Statement is materially misleading in numerous respects and omits material facts. Indeed, Defendants make certain partial disclosures in the Recommendation Statement that must be supplemented so as to make them not materially misleading.

127.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to decide whether to tender their shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to expiration of the tender offer currently set for August 22, 2016.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act**
**(Against All Individual Defendants)**

128.    Plaintiff repeats all previous allegations as if set forth in full herein

129.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Recommendation Statement was materially misleading to Company stockholders.

130.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Recommendation Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Recommendation Statement.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Registration Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

131.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of HeartWare's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being

28

concealed from the Company's stockholders and that the Recommendation Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Recommendation Statement and are therefore responsible and liable for the misrepresentations contained herein.

132.    The Individual Defendants acted as controlling persons of HeartWare within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause HeartWare to engage in the wrongful conduct complained of herein. The Individual Defendants controlled HeartWare and all of its employees. As alleged above, HeartWare is a primary violator of Section 14 of the Exchange Act and SEC Rule 14d-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

### COUNT IV
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

133.    Plaintiff repeats all previous allegations as if set forth in full herein.

134.    The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care and loyalty owed to the public stockholders of HeartWare and have acted to put their personal interests ahead of the interests of HeartWare stockholders.

135.    The Individual Defendants' recommendation of the Proposed Transaction will result in a change of control of the Company that imposes heightened fiduciary responsibilities to maximize HeartWare's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

136.    The Individual Defendants have breached their fiduciary duties of loyalty and good faith owed to the stockholders of HeartWare because, among other reasons:

(a)     they failed to take steps to maximize the value of HeartWare to its public stockholders and pursued a single-bidder sales process despite having received unsolicited indications of interest;

(b)     they failed to properly value HeartWare;

(c)     they ignored or did not protect against the numerous conflicts of interest resulting from the directors' and officers' own interrelationships or connection with the Proposed Transaction; and

(d)     sought stockholder approval through a materially false and misleading proxy statement.

137.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of HeartWare's assets and will be prevented from benefiting from a value-maximizing transaction.

138.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

139.    Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and her counsel as Class counsel;

(B)     declaring that the Recommendation Statement is materially false and/or misleading;

(C)     enjoining, preliminarily and permanently, the Proposed Transaction;

(D)     if the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(F)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Dated:  August 8, 2016

s/ Mitchell J. Matorin
Mitchell J. Matorin (BBO# 649304)
**MATORIN LAW OFFICE, LLC**
18 Grove Street, Suite 5
Wellesley, MA 02482
(781) 453-0100

**OF COUNSEL**

**LEVI & KORSINSKY LLP**
Joseph Levi, Esq.
Michael H. Rosner, Esq.
Justin G. Sherman, Esq.
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171